Charles M. Izzo, Attorney "CI-4691"
P.O. Box 2936
534 Cooper Street
Camden, New Jersey  08102
(856)757-0550 [Fax (856)757-9071]

1:08-CV-01192 JBS

United States Bankruptcy Court
District of New Jersey, Camden Division

In re: Lorraine Rossiter
               Debtor  :  APPELLANT'S BRIEF

Chapter 13 No.07-27999 GMB

## Table of Contents

A. Table of Contents --------------------------- 1.

B. Jurisdiction-------------------------------1.

C. Statement of Issue------------------------- 1.

D. Statement of the Case----------------------1-3

E. Argument ----------------------------------3-9

F. Conclusion --------------------------------- 9

## Cases, Statutes and Other Authority

Pub. L. 103-394, sec. 301 ------------------------ 3

11 USC 1322 ( c ) ------------------------------- 3

Legislative Statement --------------------------4,5

Dunaway, Baxter "Effect of the Bankruptcy Reform Act of 1994 on real estate",
RealProperty Probate and Trust Journal 1996. ------------------------------- 6

BFP V. RESOLUTION TRUST CORP., 511 U.S. 531(1994)
------------------------6,7,8,9

## Jurisdiction

The debtor appeals from on order of the Bankruptcy Court as permitted by 28 USC 158 (a)(1).

## Issue

**Whether the explicit language of the 1994 Amendment to 11 USC 1322 (c) should be disregarded in the context of a New Jersey Tax certificate strict foreclosure.**

## Statement of the Case

The appellant, Lorraine Rossiter, is a debtor in a Chapter 13 Bankruptcy pending before the Bankruptcy Court in this district. She has filed this appeal on a single issue. Essentially the Bankruptcy Court has agreed with the appellee in this matter to the effect that 11 USC 1322 (c)(1) can not be read literally in her case so as to preserve her right to cure the foreclosure judgment against her residence. The appellee draws a distinction not found in the Bankruptcy statute between foreclosure of a mortgage lien or presumably a judgment lien and foreclosure of an investor owned tax lien which they would place outside of the realm of being controlled under this Bankruptcy statute.

The Debtor by means of a 2004 quit-claim deed from her mother Ada Rossiter, became the owner of her residence known as 74 Girard Avenue, Erial (Gloucester Township, Camden County) New Jersey. The deed was apparently recorded in 2007. On her Bankruptcy schedules

filed in this case, Ms. Rossiter valued her residence at $175,000.00. Although a subsequent appraisal performed for Commerce Bank estimates the Market values at more or less $150,000.00 the effect is the same and the value of the property is not a key item of contention is this case.  It is also un-controverted that the appellee an LLC known as "Betty Simon Trustee" made a modest investment in a tax sale certificate secured by the subject property in 2003.  Through payment of subsequent taxes and by earning statutory interest on the certificate the amount required to redeem the certificate had climbed to $20,875.33 as evidenced by the appellee's certification of that fact on February 1, 2007.  It is true that judgment of foreclosure was entered by the Superior Court of New Jersey on July 18, 2007.

    Ms. Rossiter filed this proceeding under Chapter 13 on December 6, 2007 and therewith filed a Chapter 13 Plan proposing to cure the default that led to the foreclosure judgment. The Debtor pointed out the explicit language of 11 USC 1322 ( c ) as authority for her right to cure that default.  The Court rejected the debtors proposal to cure the default finding that her rights had been cut-off by the entry of the judgment.  The Bankruptcy therefore granted Betty Simon Trustee relief from the stay on January 22, 2008.  The Debtor appeals from that finding.

    Ada Rossiter, the debtor's mother, who had executed the quit claim deed to the debtor died on December 23, 2007 after the

3

foreclosure judgment was entered and shortly after this Chapter 13 case was filed by Lorraine Rossiter.

## Argument

In 1994 Congress enacted an extensive reform of the Bankruptcy Code. Among the reforms and revisions was Pub. L. 103-394, sec. 301. That enactment was codified as 11 USC 1322 ( c ) and re-designated former subsection ( c ) as new subsection (d).The new statute says :

(c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law -

> (1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law; and

> (2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

It is the paragraph number 1 that the debtor relies on in this appeal. The statute grants the debtor a right to cure the default with respect to her personal residence "until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law. The foreclosing lien-holder, Betty Simon Trustee argues that the Congress can not have intended to grant that right to Lorraine Rossiter since the foreclosure of the lien on her residence was prosecuted under a regime referred to as "strict foreclosure."

4

There is, however, no such exception in the 1994 Bankruptcy Statute and no reason to find that one was implied or intended by Congress. The legislative notes on the 1994 reform do not seem to address the issue

### HISTORICAL AND REVISION NOTES
#### LEGISLATIVE STATEMENTS

Section 1322(b)(2) of the House amendment represents a compromise agreement between similar provisions in the House bill and Senate amendment. Under the House amendment, the plan may modify the rights of holders of secured claims other than a claim secured by a security interest in real property that is the debtor's principal residence. It is intended that a claim secured by the debtor's principal residence may be treated with under section 1322(b)(5) of the House amendment.

Section 1322(c) adopts a 5-year period derived from the House bill in preference to a 4-year period contained in the Senate amendment. A conforming change is made in section 1329(c) adopting the provision in the House bill in preference to a comparable provision in the Senate amendment.

Tax payments in wage earner plans: The House bill provided that a wage earner plan had to provide that all priority claims would be paid in full. The Senate amendment contained a special rule in section 1325(c) requiring that Federal tax claims must be paid in cash, but that such tax claims can be paid in deferred cash installments under the general rules applicable to the payment of debts in a wage earner plan, unless the Internal Revenue Service negotiates with the debtor for some different medium or time for payment of the tax liability.

The House bill adopts the substance of the Senate amendment rule under section 1322(a)(2) of the House amendment. A wage earner plan must provide for full payment in deferred cash payments, of all priority claims, unless the holder of a particular claim agrees with a different treatment of such claim.

#### SENATE REPORT NO. 95-989

Chapter 13 is designed to serve as a flexible vehicle for the repayment of part or all of the allowed claims of the debtor. Section 1322 emphasizes that purpose by fixing a minimum of mandatory plan provisions.

Subsection (a) requires that the plan submit whatever portion of the future income of the debtor is necessary to implement the plan to the control of the trustee, mandates payment in full of all section 507 priority claims, and requires identical treatment for all claims of a particular class.

Subsection (b) permits a chapter 13 plan to (1) divide unsecured claims not entitled to priority under section 507 into classes in the manner authorized for chapter 11 claims; (2) modify the rights of holders of secured and unsecured claims, except claims wholly secured by real estate mortgages; (3) cure or waive any default;

```
     (4) propose payments on unsecured claims concurrently with payments
on any secured claim or any other class of unsecured claims; (5)
provide for curing any default on any secured or unsecured claim on
which the final payment is due after the proposed final payment
under the plan; (6) provide for payment of any allowed postpetition
claim; (7) assume or reject any previously unrejected executory
contract or unexpired lease of the debtor; (8) propose the payment
of all or any part of any claim from property of the estate or of
the debtor; (9) provide for the vesting of property of the estate;
and (10) include any other provision not inconsistent with other
provisions of title 11.
     Subsection (c) limits the payment period under the plan to 3
years, except that a 4-year payment period may be permitted by the
court.
```

Commentators have analyzed the 1994 statute in the context of mortgage foreclosures. The law is settled that the new section 1322 codifies the former "majority rule that, without regard to state law or contract, a Chapter 13 debtor can cure defaults and maintain payments on a home mortgage under Section 1322(b)(5) as long as a foreclosure sale did not occur prior to the petition." "Effect of the Bankruptcy Reform Act of 1994 on real estate", **Dunaway, Baxter, Real Property Probate and Trust Journal, Winter 1996**

Counsel for Betty Simon Trustee, in this matter, is advancing a theoretical argument that Congress can not have meant to affect the regime of Tax Certicate foreclures when it enacted the 1994 statute because that would be in disregard of New Jersey Law that seems to cut off such rights without a "foreclosure sale."

The 1994 statute does, undeniably however, abrogate the application of state law in a foreclosure case. The absolute right of a foreclosing credtor to pursue its rights granted in its judgment under state law and thereby evict the foreclosed owner in order to obtain actual possession of the property is pre-empted. That state law right is now subject to a debtor's rights set forth in the Bankruptcy Code.

In other areas however, the Supreme Court has ruled that some circumstances do arise that require the Court to look through the

language of the Bankruptcy Code in order to grant deference to certain state law regimes.

> **Surely Congress has the power pursuant to its constitutional grant of authority over bankruptcy, U.S. Const., Art. I, 8, cl. 4, to disrupt the ancient harmony that foreclosure law and fraudulent conveyance law, those two pillars of debtor-creditor jurisprudence, have heretofore enjoyed. But absent clearer textual guidance than the phrase "reasonably equivalent value" - a phrase entirely compatible with preexisting practice - we will not presume such a radical departure. See United Savings Assn. of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365. 380 (1988); Midlantic Nat. Bank v. New Jersey Dept. of Environmental Protection, 474 U.S. 494,501 (1986); cf. United States v. Texas, 507 U.S. \_\_\_, \_\_\_ (1993) (slip op., at 4) (statutes that invade common law must be read with presumption favoring retention of long-established principles absent evident statutory purpose to the contrary) <u>BFP V. RESOLUTION TRUST CORP</u>., 511 U.S. 531(1994)**

The issue then for appeal is, in what circumstances, is the language of the Bankruptcy Code so derogative of an interest protected by existing state law so that it becomes impossible for the Bankrupcty Court to apply the statute the way it was written by Congress. In the case cited, the Supreme Court in a 5-4 decision, over an extensive dissent, ruled that the concept of reasonable fair value was a state law matter that would not subject foreclosure sales to the proscription against fraudulent transfers immediately before a Bankruptcy.

Ms. Rossiter's case, however, is one of of strict foreclosure law. Strict foreclosure practice is not so amenable to that manner of reading of the Bankruptcy Statute.

Strict foreclosure itself is apparently an anachroism, somewhat abhorrent to modern justice and due process. Justice Scalia writing for the majority in the <u>BFP v. Rresolution Trust</u> case illuminates the subject as follows.

**The history of foreclosure law also begins in England, where courts of chancery**

developed the "equity of redemption" - the equitable right of a borrower to buy back, or redeem, property conveyed as security by paying the secured debt on a later date than "law day," the original due date. The courts' continued expansion of the period of redemption left lenders in a quandary, since title to forfeited property could remain clouded for years after law day. To meet this problem, courts created the equitable remedy of foreclosure: after a certain date, the lender would be forever foreclosed from exercising his equity of redemption. This remedy was called strict foreclosure, because the borrower's entire interest in the property was forfeited, regardless of any accumulated equity. See G. Glenn, 1 Mortgages 3-18, 358-362, 395-406 (1943); G. Osborne, Mortgages 144 (2d ed. 1970). The next major change took place in 19th century America, with the development of foreclosure by sale (with the surplus over the debt refunded to the debtor) as a means of avoiding the draconian consequences of strict foreclosure. Osborne, supra, at 661-663; Glenn, supra, at 460-462, 622. Since then, the States have created diverse networks of judicially and legislatively crafted rules governing the foreclosure process, to achieve what each of them considers the proper balance between the needs of lenders and borrowers. All States permit judicial foreclosure, conducted under direct judicial oversight; about half of **BFP V. RESOLUTION TRUST CORP., 511 U.S.531(1994)** the States also permit foreclosure by exercising a private power of sale provided in the mortgage documents. See Zinman, Houle, & Weiss, Fraudulent Transfers According to Alden, Gross and Borowitz: A Tale of Two Circuits, 39 Bus.Law. 977, 1004-1005 (1984). Foreclosure laws typically require notice to the defaulting borrower, a substantial lead time before the commencement of foreclosure proceedings, publication of a notice of sale, and strict adherence to prescribed bidding rules and auction procedures. Many States require that the auction be conducted by a government official, and some forbid the property to be sold for less than a specified fraction of a mandatory presale fair market value appraisal. See id., at 1002, 1004-1005; Osborne, supra, at 683, 733-735; G. Osborne, G. Nelson, & D. Whitman, Real Estate Finance Law 9, 446-447, 475-477 (1979). When these procedures have been followed, however, it is "black letter" law that mere inadequacy of the foreclosure sale price is no basis for setting the sale aside, though it may be set aside (under state foreclosure law, rather than fraudulent transfer law) if the price is so low as to "shock the conscience or raise a presumption of fraud or unfairness." Osborne, Nelson, & Whitman, supra, at 469; see also Gelfert v. National City Bank of New York, 313 U.S. 221, 232 (1941); Ballentyne v. Smith, 205 U.S. 285, 290 (1907).

This, however unfortunately, is the position of the appellee Betty Simon Trustee in this matter. It asks the Court to throw out a plinly worded provision of the 1994 Bankruptcy Reform act in order to preserve the ancient practice of strict foreclosure with the full measure of its "draconian consequences" for Lorraine Rossiter.

There is no compelling reason or overriding need for the Bankruptcy Court to perpetuate this form injustice by disregarding the black letter law federal on this subject. The Congress has directly considered the subject and has rejected the concept of

forfieture of real property rights without at least a public sale. Congress could have limited the 1994 statute to consensual liens or mortgage liens but it chose not to do so. It chose, on the other hand, to use the most expansive way imaginable to describe the foreclosure circumstances that might arise. "Default with respect to or that gave rise to a lien on the Debtor's personal residence." Congress carefully used the general terminology so that the statute would not be limited to mortgage defaults only.

Moreover, the Court has no reason to wrestle with a strained analysis of the application of any law when the law itself is so plainly worded as it is here. In the dissenting opinion of the BFP case Justice Souter for the minority explains that:

> **Our cases impose no such burden on Congress, however. To be sure, they do offer support for the proposition that when the Bankruptcy Code is truly silent or ambiguous, it should not be read as departing from previous practice, see, e.g., Dewsnup v. Timm, 502 U.S. ___ (1992); Butner v. United States, 440 U.S. 48,54 (1979). But we have never required Congress to supply "clearer textual guidance" when the apparent meaning of the Bankruptcy Code's text is itself clear, as it is here. See Ron Pair, 489 U.S. at 240 ("[I]t is not appropriate or realistic to expect Congress to have explained with particularity every step it took. Rather, as long as the statutory scheme is coherent and consistent, there generally is no reason to inquire beyond the plain language of the statute"); cf. Dewsnup, 502 U.S. ___ (slip op., at 15) (SCALIA, J., dissenting) (Court should not "venerat[e] `pre-Code law'" at the expense of plain statutory meaning).** BFP V. RESOLUTION TRUST CORP., 511 U.S.531(1994)

> Rather than allow state practice to trump the plain meaning of federal statutes, cf. Adams Fruit Co. v. Barrett, 494 U.S. 638,648 (1990), our cases describe a contrary rule: whether or not Congress has used any special "preemptive" language, state regulation must yield to the extent it actually conflicts with federal law. This is no less true of laws enacted under Congress's power to "establish . . . uniform Laws on the subject of Bankruptcies," U.S. Const., Art. I, 8, cl. 4., than of those passed under its Commerce Clause power. See generally Perez v. Campbell, supra; cf. id., at 651-652 (rejecting the "aberrational doctrine. . . that state law may frustrate the operation of federal law as long

9

as the state legislature in passing its law had some purpose in mind other than one of frustration"); Cipollone v. Liggett Group, Inc., 505 U.S. ___, ___ (1992) (slip op., at 2-3) (SCALIA, J., concurring in part) (arguing against a "presumption against preemption" of "historic police powers")

## Conclusion

Lorraine Rossiter has defaulted on a $20,000.00 tax certificate lien secured by her $150,000.00 residence. She now comes before the Bankruptcy Court with a feasible Plan to redeem the tax lien at 100% of the amount claimed along with additional interest and costs that will accrue in that process. The creditor, however, refuses to accept redemption. It seeks title and possession of her home. In particular it would claims the benefit of its draconian remedy conferred in only these narrow circumstances by an outdated New Jersey strict foreclosure practice. It is not a close case or an appeal by a disadvantaged debtor for equitable intervention. In fact it is the appellee that is hoping this Court would disregard the plain language of the controlling law. The law must be read and applied as it is. The Debtor must be afforded the same rights under 11 USC 1322 as are routinely granted to thousands of other debtors in every district of the United States Bankruptcy Court.

3/26/08

Respectfully submitted,

S/Charles M. Izzo
Attorney for the Appellant

10

**Miscellaneous:**

07-27999-GMB Lorraine S. Rossiter
Type: bk                  Chapter: 13 v              Office: 1 (Camden)
Judge: GMB                Assets: y                  Case Flag: DebtEd, APPEAL

## U.S. Bankruptcy Court

## District of New Jersey

Notice of Electronic Filing

The following transaction was received from Izzo, Charles M. entered on 3/26/2008 at 7:24 PM EDT and filed on 3/26/2008
**Case Name:**      Lorraine S. Rossiter
**Case Number:**    07-27999-GMB
**Document Number:** 38

**Docket Text:**
First Document re: Appellant's Brief (related document:[25] Notice of Appeal, filed by Debtor Lorraine S. Rossiter) filed by Charles M. Izzo on behalf of Lorraine S. Rossiter. (Izzo, Charles)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**F:\Files\BANKRUPTCY\Active\RossiterAppBrief3.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1002741850 [Date=3/26/2008] [FileNumber=18071696-0] [29b246ba0b73f45b066b77b44c10291a2c17e27cb9a6f658ee4cc70fe9070e62c3 16fc1d019956bc4a83133328175ebb19b7095d4e90b29b4c5c94937a23f2d3f]]

**07-27999-GMB Notice will be electronically mailed to:**
U.S. Trustees Office

Isabel C. Balboa    ecfmail@standingtrustee.com

Keith A. Bonchi     keith@gmslaw.com

Charles M. Izzo     cminj2001@yahoo.com

**07-27999-GMB Notice will not be electronically mailed to:**